**Affirmed and Opinion filed September 2, 2021.**



In The

# Fourteenth Court of Appeals

_____

## NO. 14-19-00714-CV

_____

**METROPOLITAN TRANSIT AUTHORITY OF HARRIS COUNTY, TEXAS, Appellant**

**V.**

**VIOLA M. DOUGLAS, Appellee**

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2015-52248**

## O P I N I O N

The Metropolitan Transit Authority of Harris County, Texas (Metro) brings this interlocutory appeal from the trial court's denial of its motion for summary judgment and plea to the jurisdiction in appellee Viola Douglas's gender discrimination and retaliation lawsuit. In her lawsuit, Douglas alleged that the Metro Police Department did not promote her to the rank of captain because of her gender and that the department retaliated against her for filing a complaint and the

present lawsuit. In two issues, Metro contends that the trial court erred in failing to dismiss Douglas's discrimination and retaliation claims for want of jurisdiction.

This is the second interlocutory appeal in this case. In the first appeal, Metro unsuccessfully contested the trial court's denial of an earlier plea to the jurisdiction that challenged the sufficiency of Douglas's pleadings. *Harris Cty. Metro. Trans. Auth. v. Douglas*, 544 S.W.3d 486, 492 (Tex. App.—Houston [14th Dist.] 2018, pet. denied). In the present appeal, Metro contests the trial court's denial of Metro's subsequent plea to the jurisdiction and motion for summary judgment, which challenged the existence of jurisdictional facts. We affirm.

### *Governing Law*

As a governmental unit, Metro is immune from suit absent an express waiver of governmental immunity. *Alamo Heights I.S.D. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018); *Douglas*, 544 S.W.3d at 492. The Texas Commission on Human Rights Act (TCHRA) provides a limited waiver of that immunity from suit when a governmental unit has discriminated in any manner against any employee on the basis of age, sex, or other protected classification, or has retaliated against the employee for opposing or complaining of such discrimination. Tex. Lab. Code §§ 21.002(8)(d) (defining "employer" to include "a county, municipality, state agency, or state instrumentality"), 21.051 (prohibiting discrimination by employer), 21.055 (prohibiting retaliation by employer), 21.254 (allowing civil action); *Mission Consol. I.S.D. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008); *Douglas*, 544 S.W.3d at 492.

To prevail on a claim of immunity from suit, a governmental defendant may challenge (1) whether the plaintiff has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the case, as Metro did in its first plea to the jurisdiction; (2) the existence of jurisdictional facts, as Metro did in its second plea

2

and motion for summary judgment; or (3) both. *See Tex. Dep't of Transp. v. Lara*, No. 19-0658, 2021 WL 2603689, at *3–4 (Tex. June 25, 2021). When, as here, the defendant challenges the existence of jurisdictional facts, the court must move beyond the pleadings and consider evidence. *See id*. The analysis then mirrors that of a traditional summary judgment. *Id*.

When the defendant challenges the plaintiff's allegations with sufficient supporting evidence, the plaintiff must raise at least a genuine issue of material fact to avoid dismissal. *Alamo Heights*, 544 S.W.3d at 771; *Metro. Transit Auth. of Harris Cty. v. Carter*, No. 14-19-00422-CV, 2021 WL 126687, at *4 (Tex. App.—Houston [14th Dist.] Jan. 14, 2021, no pet.) (mem. op.). When the evidence submitted to support the plea implicates the merits of the case, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Alamo Heights*, 544 S.W.3d at 771. In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not. *Id*.

We review a trial court's rulings on the plea to the jurisdiction and motion for summary judgment de novo. *See Carter*, 2021 WL 126687, at *5. Because the legislature intended for state law to correlate with federal law in employment discrimination cases, we may look to analogous federal cases when applying TCHRA. *See* Tex. Lab. Code § 21.001; *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Douglas*, 544 S.W.3d at 492.

There are two methods of proof in cases alleging disparate treatment. The first involves using direct evidence of what the defendant did and said to prove discriminatory intent. *See Mission Consol. I.S.D. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012). However, because direct evidence of discrimination is rare in

employment cases, claimants often must rely on indirect or circumstantial evidence of discrimination. *See Coll. of the Mainland v. Glover*, 436 S.W.3d 384, 392–93 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Under the latter method, courts follow the burden-shifting mechanism set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).

Under the *McDonnell Douglas* framework, the plaintiff is entitled to a presumption of discrimination if she can present a prima facie case of discrimination. *See Garcia*, 372 S.W.3d at 634. The precise elements of a prima facie case vary depending on the circumstances, but the plaintiff's burden at this stage is not onerous. *Id.* The prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the employment action. *See Navy v. Coll. of the Mainland*, 407 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2013, no pet.). If the defendant articulates a legitimate, nondiscriminatory reason for its decision, the burden then shifts back to the plaintiff to show either that the stated reason was a pretext for discrimination or that even if the reason was true, discrimination was also a motivating factor for the adverse employment action. The *McDonnell Douglas* framework applies to jurisdictional issues such as those raised in this appeal, both in the discrimination and the retaliation contexts. *See Alamo Heights*, 544 S.W.3d at 781-83; *see also Univ. of Tex. Sw. Med. Ctr. v. Vitetta*, No. 05-19-00105-CV, 2020 WL 5757393, at *7–8 (Tex. App.—Dallas Sept. 28, 2020, no pet.) (mem. op.); *Avila v. United Parcel Serv., Inc.*, No. 03-18-00233-CV, 2018 WL 4100854, at *4 (Tex. App.—Houston [14th Dist.] Aug. 29, 2018, no pet.) (mem. op.).

# I. Discrimination Claims

In its first issue, Metro contends that the trial court erred in failing to dismiss Douglas's discrimination claims for want of jurisdiction. We will begin by reviewing Douglas's claims and then will turn to Metro's motion and the evidence provided by both parties.

## A. Douglas's Pleadings

In her Fourth Amended Petition, Douglas alleged that Metro discriminated against her in 2014 because of her gender when two male candidates for the rank of captain were promoted instead of her. Douglas asserted that Metro PD "has a long history of discrimination against women," has had only one female captain in its history, and currently has no female captains. She claimed that statistically, it takes women in the department longer to be promoted than their male counterparts.

In 2012, Metro issued a memorandum outlining the promotional process after an applicant for a prior open captain's position raised concerns about the fairness of the internal promotional procedure. The assessment and selection process was to be led by an outside consultant, the Law Enforcement Management Institute of Texas, and would include an outside panel of law enforcement professionals. Since January 31, 2012, all promotions had used this process, including those for the sergeant and lieutenant ranks, until the captain openings in the present case in September 2014. In place of the outside-led process, the Metro police chief at the time, Tim Kelly, decided that the three candidates for captain in 2014 would first interview with a five-person panel of Metro employees chosen by Kelly and then would interview with him personally. At the time, Kelly was aware that when Douglas was promoted to lieutenant in 2012, the outside-led promotional process had ranked her first out of eleven candidates, a field which also included both male applicants for captain in 2014.

5

After tabulation of the panel interview scores, Douglas was the highest-scoring candidate. Kelly was aware of this at the time of his one-on-one interviews with the candidates. Kelly was also aware that he would soon be leaving his post as chief for a position as a vice president of Metro and the promotion of his replacement as chief, Captain Vera Bumpers, would open a second captain position for the three candidates to fill. After Kelly's interview scores were added to the panel scores, Douglas went from being ranked first to ranked last. Kelly then promoted the two male candidates over Douglas.

Douglas also pointed out that one of the male 2014 candidates, Felix Vara, was allowed to participate in the promotional process despite the fact that he had been disciplined within the prior year for a serious violation of department rules and Metro PD had a long-standing policy of disqualifying any officer who had been disciplined within the prior year from promotion. Douglas contended that "Kelly's interview questions were completely subjective and had no reasonable relationship to an individual's qualifications for the position as captain." Kelly also admitted to Douglas that he had decided to promote the two male candidates based on his "gut" feeling. Douglas further asserted that Kelly's decision not to promote her was due in part to the fact that Bumpers was being promoted to replace Kelly and become the department's first female chief and Kelly wanted to avoid having "too many women" in high-ranking positions. Douglas was the only female who had been promoted to sergeant over the eighteen-year period under Kelly and another former chief. According to Douglas, "Kelly had frequently told [her] that she did not need to worry about a promotion because she had a husband to take care of her."

## B. Metro's Motion

In its combined motion for summary judgment and plea to the jurisdiction,

6

Metro asserted that it had legitimate reasons for not promoting Douglas and that Douglas could not establish a genuine issue of material fact that such reasons were mere pretext for discrimination. Metro points to Kelly's stated reasons for promoting the two male candidates, Vara and Darrin Lewis, over Douglas, respectively: "Highest score on interview; understands big picture and need for partnership" and "[s]econd highest score; understands collaboration and working with staff/communications." Metro insisted that it adhered to a two-step interview process and selected the highest ranked candidates that resulted from that process. It maintained there is no evidence of a discriminatory animus in Kelly's actions and Douglas relies only on her subjective belief that she was discriminated against.

Metro further asserted that Douglas cannot show either that she was clearly better qualified than the male candidates or that Metro's reasons for not promoting her were false or unworthy of credence. Metro stated that the three candidates had similar backgrounds and experiences, with all three having worked for Metro for over twenty years and having been promoted to lieutenant in 2012. Metro claimed that it is immaterial Douglas ranked first after the panel interview scores were tabulated because that was just the first step in the process and she scored last after Kelly's points were added to the totals. Metro also asserted that there was no official policy preventing Vara from being considered for promotion in light of his disciplinary history and that the job posting for the captaincies did not list any discipline-based bar. Metro stated that Kelly determined Vara's violation did not detract from his qualifications, Douglas's personal opinion to the contrary is irrelevant, and the court should not substitute its opinion for Kelly's.

Metro pointed out that mere favoritism or familiarity does not equate to unlawful discrimination and asserted Douglas can provide no proof of discriminatory animus in this case. Moreover, Metro insists that the use of

7

subjective criteria in the promotional process alone is not sufficient to demonstrate pretext.

## C. The Evidence

We now turn to the evidence presented by the parties. Although both sides filed additional materials for background and context purposes, we will confine our discussion to the most relevant items.

**Metro's evidence.** Metro provided the 2014 job posting for the captain position, which did not state anything regarding potential candidates' disciplinary records. A "Guideline" from the Metro Human Resources Department, dated February 14, 2013, stated that panel interviews were to be "the standard method of selection of an applicant(s) for approved salaried (non-union) full or part-time vacancies at METRO." The guideline also provided that panels may include external stakeholders and the hiring manager may conduct final one-on-one interviews.

The panel scoresheets for the 2014 captain interviews show Douglas scored a total of 45.6, Lewis 43.4, and Vara 39.2. Douglas scored the highest for three panelists and second for the other two. Lewis and Vara were each the favorite of only one panelist. Kelly scored the interviews as follows: Vara 60, Lewis 50, and Douglas 41. The total therefore flipped the order of the panel scoring, i.e., Vara 99.2, Lewis 93.4, and Douglas 86.6.

A matrix showing the qualifications of the applicants reveals that all three had been with Metro for over 20 years and all made lieutenant in 2012; Douglas was a sergeant for ten years, Vara for six, and Lewis for four. The matrix also showed that Vara was the only candidate who held a master's degree and had gone through a LEMIT program, Douglas was the only candidate who had gone through

Metro Leadership and FBI training courses, and Lewis was the only one who completed a Houston Community College leadership course. An interview assessment form signed by Kelly records that Vara was selected for the first opening because he had the "[h]ighest score on interview; understands big picture and need for partnership," and Lewis was named as alternate because he had the "[s]econd highest score; understands collaboration and working with staff/communications."

In a declaration by Kelly, he stated that he was the hiring manager for the two captain positions and prepared job-related questions for the interviews. He explained that he decided not to use the outside assessment process installed by a prior chief because the pool of candidates was small, the positions are high ranking, and he had personal experience with each of the candidates. He said that he had the authority as chief to decide what promotional process to use, there was no departmental policy that would exclude Vara from consideration due to his disciplinary history, and that history did not detract from his being the best candidate. Kelly further insisted that Vara and Lewis were better choices because they had greater abilities to communicate and better relationships with subordinates and Douglas's answers in the interview did not seem genuine. He said that gender was not a factor in his decision and he did not believe there were too many women in high positions in the department. The record also contains Kelly's notes that he took during the three interviews.

Metro provided an excerpt from Carl Clark's deposition in which he stated that he had heard Vara was "Kelly's candidate" and Lewis was "Bumpers' candidate." Metro also provided a copy of a departmental order from 2008 that purports to set guidelines to govern promotions, includes the possibility of personal interviews, and does not mention disciplinary actions as a bar to promotion. A

9

revision of this order from 2015 states that at the discretion of the chief, a candidate may be removed from eligibility and, for the captain rank, the chief was to set the criteria and selection procedures. Also, under minimum requirements for all promotions, it states: "Have no sustained disciplinary action within the 12-month period prior to application."

Both parties presented evidence regarding Vara's disciplinary matter that occurred within twelve months of the promotional process. Vara had apparently been driving a Metro vehicle when he was involved in an accident and the vehicle had to be towed. At least one statement in the record indicates Vara was not at fault in the accident, but per Metro policy and Federal Transit Administration regulations, he was not supposed to leave the scene of the accident until tested for drugs and alcohol or released by a service supervisor. Vara left the scene without being tested or properly released. He then failed to answer numerous calls to his cell phone and gave inconsistent accounts of why. Vara told an investigator that he did not check his voicemail until around 8:30 or 9 p.m. and by then he had taken a Tylenol PM; however, Vara's cell phone records showed he checked his voicemail at 6:30 p.m., and his supervisor at the time said Vara admitted he had a couple of beers before checking his voicemail. A disciplinary review board gave Vara a six-day suspension without pay, which was described as "serious" discipline. One member of the board averred that Kelly had influenced the board not to terminate Vara's employment.

**Douglas's evidence.** Among her evidence, Douglas provided a declaration from Victor Rodriguez, who was the Metro PD chief from 2011 until August 2014. He averred that the department had a longstanding policy or practice of not promoting anyone who had been disciplined in the last year, which is similar to policies at many police departments. Although Rodriguez believed the severity of

10

the infraction should be taken into account, he was unable to get such a rule change made before he left the department, which was one month before the promotional process at the heart of this case began. He said that Vara violated Metro's drug and alcohol policy, and such violation would normally result in a termination of employment because it must be reported to the Federal Transit Administration. Rodriguez also said that the suspension Vara received was serious discipline and would have barred him from promotion at most police departments.

Former Captain Carl Clark also provided a declaration in which he stated that in 2012, he and Bumpers were the only eligible candidates for two open captain positions when Chief Rodriguez relaxed the requirements. When Clark hired an attorney who filed a letter of complaint, Rodriguez issued a memorandum explaining a new departmental promotional process that would be led by outside consultant LEMIT. This was subsequently followed by a memorandum from the human resources department explaining that the LEMIT-led process would be used "for all of the MPD Captain vacancies." Clark said that after he was promoted, he met with Tom Lambert who was then the chief executive officer of Metro and Lambert assured Clark that the LEMIT-led procedure would be used for all future promotions to captain. On that basis, Clark said that he agreed he would not pursue any potential litigation against Metro.

Clark also pointed out that Bumpers had been a lieutenant for twenty years before she became a captain, which was much longer than normal. She participated in several promotional processes without being promoted. Bumpers told Clark several times that Kelly evaluated her performance lower than her male counterparts and often unreasonably low. Clark said that from 1993 to 2002, no women were promoted within Metro PD except for Douglas to sergeant, and that occurred in 2002 through a process conducted by an outside agency affiliated with

11

the University of Houston.

Clark also said that it was the policy of Metro PD for the entire 29 years he worked there that officers were not eligible for promotion if they had been disciplined in the prior year. He said that after Vara was promoted in 2014 despite this policy, he asked Bumpers, who was then chief, about it and she said, "That was up to Kelly. You know Metro does what it wants to do, and Kelly and Felix are friends."

In her declaration, Douglas stated that she worked for Metro from 1992 until July 2019. In 2001, she was ineligible for promotion to sergeant due to a disciplinary matter. In 2002, she made sergeant through a process run by an outside assessment center in which she made the highest score of all candidates. In 2004, a female candidate for lieutenant scored the highest in a promotional process run by Kelly, but she was still awaiting promotion in 2005 when the process was stopped. After the female candidate rolled off the eligibility list, a male candidate was promoted to lieutenant.

In 2005, Douglas applied for an open lieutenant position. She and a male candidate were the only ones to pass the written portion of the assessment. While waiting on the final part of the promotional process, Metro changed the final portion from an exercise dealing with different leadership scenarios to one requiring the candidates to write a memo analyzing High Occupancy Vehicle lanes, an area that the male candidate was currently assigned to work. The male candidate received the promotion. Douglas believes the change in the process was designed to benefit the male candidate. In 2012, Douglas scored the highest in a promotional process led by an outside assessment center. She scored higher than eleven male candidates, including Vara and Lewis, and got the promotion to lieutenant.

12

According to Douglas, between 1993 and 2014, only two females were promoted within Metro PD, herself and Bumpers, and both received promotions only when an outside agency ran the process. Both Douglas and Bumpers went through several internally run processes without receiving promotions. Douglas also stated that in her 27 years with Metro, there was always a policy in place that officers who had received discipline within the past year were ineligible for promotion; she herself was barred from promotion in 2001, and there was no change or announcement regarding this policy before Vara was promoted.

In 2014, when it was rumored that Kelly was not going to use an outside assessment center in the promotional process, Douglas asked him about it, and he told her that because all three candidates were qualified, it would be a waste of money to use a consultant. Douglas said that she became immediately concerned about this because the old process was biased against women candidates. Also, while she had worked for five chiefs or assistant chiefs in the prior five years, Kelly was the only one of those to have evaluated her at less than "distinguished." When she asked Kelly why he promoted the male candidates over her, he replied that he went with his "gut." Douglas additionally reported that Chief Bumpers had told her Kelly viewed Bumpers as a figurehead, had taken her place at a regional chiefs meeting, and was undermining her with subordinates.

### D. Analysis

**Douglas's prima facie case.** Metro has conceded, for purposes of its motion and plea, that Douglas can establish a prima facie case of discrimination because (1) she is a member of a protected class; (2) she sought and was qualified for an available employment position; (3) despite her qualifications, she was not selected for the position; and (4) Metro selected someone not in Douglas's protected class to fill the position. *See, e.g.*, *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d

13

633, 645 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The burden therefore shifted to Metro to articulate a legitimate, nondiscriminatory reason for the employment decision. *See Garcia II*, 372 S.W.3d at 634.

**Metro's nondiscriminatory reason.** Metro asserts that it adhered to the two-step interview process that had been used in the department previously and which Kelly had the authority to select as chief. Kelly then chose to promote the highest ranked candidates that resulted from that process. In support of his decision, Kelly noted that Vara "understands big picture and need for partnership" and Lewis "understands collaboration and working with staff/communications" but Douglas's answers during the interview were brief and did not seem genuine. Kelly's detailed notes from the interviews were offered by Metro in support of these conclusions. Metro also points out that Kelly could rely on his years of experience working with and observing the three candidates in making the hiring decisions, and Kelly denied that gender was a factor in his decision. This evidence and argument were sufficient to establish a legitimate, nondiscriminatory reason for the employment decision. *See, e.g.*, *Alvarado v. Tex. Rangers*, 492 F.3d 605, 616 (5th Cir. 2007) ("An employer's subjective reason for not selecting a candidate, such as a subjective assessment of the candidate's performance in an interview, may serve as a legitimate, nondiscriminatory reason for the candidate's non-selection."); *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 881-82 (5th Cir. 2003) (holding employer's assertion it promoted the "best qualified" two candidates constituted a legitimate, non-discriminatory justification for not promoting plaintiff); *Kennedy v. Tex. Dep't of Protective & Reg. Servs.*, No. 03-04-00608-CV, 2005 WL 3499442, at *4 (Tex. App.—Austin Dec. 22, 2005, no pet.) (mem. op.) (holding evidence satisfied burden of establishing a legitimate, nondiscriminatory reason for not hiring plaintiff where, among other things,

14

another candidate's interview performance was deemed far superior). The burden therefore shifted back to Douglas to present evidence either that the stated reason was a pretext for discrimination or that even if the reason was true, discrimination was also a motivating factor for the failure to promote her. *See Navy*, 407 S.W.3d at 899.

**Evidence of pretext.** Douglas has presented at least three categories of evidence that she contends establishes discrimination was a motivating factor for the hiring decision or that Metro's given nondiscriminatory reason was mere pretext for discrimination, including: (1) Metro PD's history of not promoting women, (2) Kelly's personal history with women in the department, and (3) Kelly's specific knowledge and actions in regard to the hiring process at issue in this case. As stated above, in reviewing this evidence, we take as true all evidence favorable to Douglas, indulging every reasonable inference and resolving any doubts in her favor. *See Alamo Heights*, 544 S.W.3d at 771.

Regarding the history of women in Metro PD, Douglas points out that Metro has only had one female captain in its history and currently does not have any. Bumpers had been a lieutenant for twenty years before making captain, which was considered longer than normal, and she and Douglas had been through several internally-run promotional processes without being promoted. Evidence indicated that from 1993 to 2002, no women were promoted within Metro PD except for Douglas when she was promoted to sergeant through a process led by an outside agency. From 1993 to 2014, only two females were promoted within Metro PD, and then only when an outside agency ran the process. During 2005, the final portion of a promotional process was reportedly changed in a way that appeared to favor a male candidate over Douglas, and the male candidate then received the promotion.

15

In relation to Kelly's history with women in the department, Douglas presented evidence indicating Kelly had evaluated both Bumpers and Douglas lower than their male counterparts, saw Bumpers as merely a figurehead as chief, and had undermined her authority over subordinates. There was also evidence suggesting Kelly was involved in stalling the promotion of a female candidate for lieutenant in 2004 until she rolled off the eligibility list and a male was then promoted to the position.

Regarding the promotional process Kelly selected and used in this case, there was evidence that Kelly's selection of a two-part internal interview process was contrary to the previously announced departmental policy of utilizing an outside assessment center to fill captain vacancies. Although Metro presented evidence of a general Metro guideline permitting panel interviews, Kelly did not cite this as a basis for foregoing the Metro PD's recent policy of utilizing outside assessment centers. Instead, Kelly stated he had the authority to make this change and did so because the pool of candidates was small, the positions are high ranking, and he had personal experience with each of the candidates. According to Douglas, he also told her he did so to save money. Regardless, even though Kelly had the authority to use only internal panel interviews, there was evidence he made that decision with the knowledge that during the 2012 externally-led promotional process for lieutenant vacancies, Douglas had scored first among eleven candidates, which included both Vara and Lewis, the male candidates for captain in 2014. This could be interpreted as an indication Kelly did not want to use an external assessment center because he then might have to promote Douglas. Additionally, Kelly knew the candidate's scores from the panel interviews when he scored his own interviews with the candidates. The fact that his scores changed the total scores such that Douglas went from first after the panel interviews to last

16

overall could also be interpreted as Kelly specifically not wanting to promote Douglas into one of the two available captain positions. Metro points out that there was also evidence that simple favoritism may have been at play and that there were legitimate reasons for Kelly to prefer Vara and Lewis over Douglas, but when coupled with the evidence above regarding Metro PD's low and slow rate of female promotions and Kelly's own relationships with women in the department, the evidence could also reasonably be considered indicative of gender discrimination.

There was also significant evidence that Kelly went against a longstanding policy or practice of the Metro PD in permitting one of the male candidates, Vara, to participate despite his having received "serious discipline" within a year of the promotional process. Although Metro presented some evidence suggesting this policy or practice was not an officially announced rule in the department and that Kelly had the authority to make that decision, significant evidence indicates Kelly deviated from normal departmental practice to preserve the candidacy of one of the male applicants.

Metro argues that Douglas's evidence does not establish either that she was clearly better qualified than Vara or Lewis or that Metro's reasons for not promoting her were unworthy of credence, citing *Southwestern Bell Telephone, L.P. v. Edwards*, No. 05-09-00606-CV, 2011 WL 3672288, at *3 (Tex. App.— Dallas Aug. 23, 2011, no pet.) (mem. op.) (suggesting plaintiff in that case "had two methods available to her to prove . . . pretext"). Even assuming, however, that Douglas is limited in this case to these two methods of proof, she has presented evidence raising a material issue of fact on both.

The "clearly better qualified" assertion hinges on how Vara's disciplinary history is viewed. All three candidates appear to have strong qualifications for the

17

job, but several witnesses averred, and at least one document appeared to demonstrate, that Vara's serious disciplinary action within a year of the promotional process should have excluded him from consideration. This raises a material question of fact as to whether Douglas was clearly better qualified than Vara. Metro points out that the job posting and description did not mention a lack of disciplinary action as a qualification for captain, but that is only some evidence, not conclusive evidence that Vara was not disqualified. Metro also argues that as chief, Kelly would know the needs of Metro and whether Vara's discipline would have detracted from his candidacy, but again, this is not conclusive evidence on the matter given the multiple witnesses to the contrary. There is a genuine issue of fact regarding whether Douglas was clearly better qualified than Vara under departmental policy and practice.

Regarding whether Metro's reasons for not promoting Douglas were worthy of credence, Metro argues that Douglas's subjective beliefs alone are insufficient to create a material issue of fact. But, as detailed above, the record contains more than merely Douglas's beliefs. Douglas presented evidence regarding Metro PD's history of not promoting women, particularly through internal processes, Kelly's history with women in the department, and Kelly's specific knowledge and actions in regard to the hiring process at issue in this case. There is a genuine issue of fact regarding whether Metro's reasons for not promoting Douglas are worthy of credence. The trial court did not err in denying Metro's plea to the jurisdiction and motion for summary judgment on Douglas's discrimination claims. *See Alamo Heights*, 544 S.W.3d at 771; *Carter*, 2021 WL 126687, at *4. Accordingly, we overrule Metro's first issue.

## II. Retaliation Claims

In its second issue, Metro contends that the trial court erred in failing to

18

dismiss Douglas's retaliation claims for want of jurisdiction. To state a prima facie case of TCHRA retaliation, an employee must show (1) she engaged in protected activity under the TCHRA, (2) she experienced a material adverse employment action, and (3) a causal link exists between her protected activity and the adverse action. *Alamo Heights*, 544 S.W.3d at 782. The causal connection required at the prima facie stage is "not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action." *Id*. Retaliation claims may be actionable under the TCHRA even if the underlying discrimination claim is not. *Id*. at 781. When jurisdictional evidence negates the prima facie case or, as in this case, rebuts the presumption it affords, some evidence raising a fact issue on retaliatory intent is required to survive a jurisdictional plea. *Id*. Again, we will review Douglas's pleadings before moving on to Metro's motion and the evidence presented.

### A. Douglas's Pleadings

In her petition, Douglas alleged that Metro retaliated against her after she filed her EEOC charge. Douglas specifically targeted the conduct of Chief Bumpers, whom Douglas contends first attempted to get Douglas's supervisor at the time, Captain Clark, to lower her performance evaluation shortly after Douglas filed her EEOC complaint. When Clark refused, Bumpers reassigned Douglas to work under Captain Vara, who was one of the male candidates promoted over Douglas and the one whom Douglas charges was ineligible for promotion. Bumpers then told Vara that Douglas had filed the complaint alleging Vara was ineligible and said Vara should not trust Douglas.

In July 2016, after Douglas's counsel informed Metro's counsel that they wanted to depose Bumpers, Bumpers ordered Vara to lower Douglas's performance evaluation after Vara gave her the highest available overall rating of

19

"distinguished." Bumpers, however, who had herself given Douglas a "distinguished" rating in 2014, could not cite any performance issues to support lowering the evaluation. Douglas states that the lowered evaluation gave her the lowest marks among the department's seven lieutenants, the other six being male. According to Douglas, performance evaluations are used in the promotional process and can be the basis for receiving or not receiving a promotion.

Douglas further asserted that both Vara and Clark testified in their depositions regarding Bumpers retaliation against Douglas, and Vara complained to Metro's human resources department that Bumpers had also retaliated against him because of his testimony. Meanwhile, Clark resigned his position after 29 years at Metro and has filed his own retaliation charge. After his deposition testimony, Bumpers allegedly told Clark that his testimony did not "comport" with her position in the case, and she indicated that he was no longer in her favor. Clark also alleges retaliatory actions that resulted in his being "constructively discharge[d]."

## B. Metro's Motion

Regarding Douglas's retaliation claims, Metro asserted that she could not establish that Metro took any materially adverse action against her or that any such action was causally connected to protected activity in which she engaged. Metro asserted that Douglas was transferred to work under Vara after filing her complaint "as part of a department-wide rotation of supervisory assignments" and that after Bumpers ordered Vara to downgrade Douglas's evaluation, Douglas successfully filed a grievance and received the higher "distinguished" rating. Metro also pointed out that the transfer was not a demotion, did not change her pay, rank, shift, commute, hours worked, or days off, and her supervisor was still a captain. Metro noted that Douglas has conceded she enjoyed working for Vara after the rotation.

20

Metro also disputed that Douglas's lowered evaluation made her the lowest ranked lieutenant in the department when five other lieutenants received a similar evaluation and one received a lower evaluation.

Regarding the causal link between Douglas's protected activity and any adverse employment action, Metro contended that its knowledge of her activity alone was not sufficient and the length of time between the protected activity and the alleged adverse actions weighed against finding causality. There were five months between Douglas's filing of her EEOC charge and her transfer and ten months between her filing this lawsuit and the lowering of her evaluation.

### C. The Evidence

**Metro's evidence.** In its evidence, Metro included a memorandum from Chief Bumpers explaining that the rotation of lieutenants and sergeants was due to promotions and departmental needs. Metro also provided the other lieutenant performance evaluations for 2016, apparently to show that Douglas's evaluation was not the lowest of the six lieutenants before she filed her grievance.

In her 2019 deposition, Douglas acknowledged that lieutenants often rotate assignments and the transfer did not change her pay, rank, shift, commute, hours worked, or days off, and her supervisor was still a captain. But she explained that the division she was in, professional standards, did not usually rotate personnel as quickly as she was rotated out to work under Vara. She also said that Vara later told her that Bumpers had told him that Douglas had filed an EEOC charge naming Vara and that he should not trust Douglas. Douglas also asserted that Bumpers had told Clark to monitor Douglas's hours, but Douglas admitted that she had enjoyed working for Vara and that no one had specifically made retaliatory statements to her. Metro also provided a deposition Douglas gave in 2016, in which she suggested Bumpers had been upset when Douglas had been named chief of staff

21

for a former police chief, a position Douglas never actually took because that chief left the department.

**Douglas's evidence.** In his declaration, Clark said that in early 2015, he was Douglas's supervisor when Bumpers started asking him to "keep an eye on Douglas" and to document it if she did anything for which she could be reprimanded. Bumpers said she did not trust Douglas and wanted Clark to find things "to write Douglas up for," but Clark refused. In May 2015, Clark gave Douglas an overall performance appraisal of "distinguished," but Bumpers became upset and wanted him to change it. When he refused, Clark says that Bumpers rated him lower than he deserved on his evaluation. At some point after Douglas was transferred to Vara's division, Vara went on medical leave and Clark completed Douglas's performance evaluation. Clark again rated Douglas distinguished, and Vara agreed. Bumpers, however, again asked Clark to lower the rating but could provide no reasoning to do so, and Clark again refused. Clark said that after he refused to lower Douglas's evaluation, Bumpers attitude toward him changed and he became marginalized and received low evaluations himself. He ultimately left the department due to perceived retaliation from Bumpers. Clark also said that Vara felt retaliated against by Bumpers after Vara gave a deposition in this case. Clark explained that performance evaluations are always considered in making promotions.

In her declaration, Douglas reported that Bumpers attempted to dissuade her from filing a complaint regarding the 2014 promotional process, saying Douglas should enjoy her time with her child. Bumpers reassigned Douglas to work under Vara after Clark would not change her performance evaluation, and Vara told Douglas that Bumpers warned him to not trust her and told her about the EEOC charge. Douglas said she felt isolated in the department after filing the charge,

22

people were not sitting by her at meetings, and another lieutenant told her that he noticed how she was being treated. Douglas listed several officers who she said told her they were leery of complaining because of what had happened to her.

## D. Analysis

Metro argues that Douglas has not presented evidence establishing the prima facie elements of an adverse employment action or a causal connection between her protected activity and any adverse employment action. *See Alamo Heights*, 544 S.W.2d at 782. More specifically, Metro asserts that neither Douglas's temporarily lower evaluation nor her transfer to work under Vara were adverse and that neither of them were causally connected to her filing an EEOC charge or this lawsuit.

An adverse employment action in the context of a retaliation claim is not limited to conduct that constitutes ultimate employment decisions. *Navy*, 407 S.W.3d at 901. Instead, individuals are protected from retaliatory actions that a reasonable employee would have found materially adverse. *Id*. "Material" employer actions are those that are likely to deter discrimination victims from complaining to the EEOC, the courts, or their employers. *Id*. Petty slights, minor annoyances, and simple lack of good manners typically will not create such deterrence. *Id*. The inquiry is fact-specific because the significance of allegedly retaliatory actions often depends on the context in which it occurs. *Id*.

We begin by looking at the lowered performance evaluation and related allegations. As described above, Douglas alleged and produced evidence to show that after she filed her EEOC charge, Bumpers attempted to have Douglas's supervisor downgrade her performance evaluation on three occasions. Twice, Clark refused, which he has asserted in part led to Bumpers also retaliating against him, including downgrading his own performance evaluation. Clark also said in his declaration that Bumpers—who had herself previously given Douglas top marks—

23

could provide no reasoning to support downgrading Douglas. Also relevant to her claim of retaliation, Douglas reported that Bumpers had previously attempted to dissuade her from filing the EEOC charge, and there was evidence Bumpers had told Douglas's supervisors to not trust Douglas and to look for things on which to reprimand her. When Douglas's supervisor Vara relented to Bumpers' demands and downgraded her evaluation, Douglas had to go through a grievance process in order to have the higher evaluation reinstated.

Metro argues that even assuming Bumpers committed these actions, they do not amount to materially adverse employment actions because ultimately the only lowered performance evaluation was subsequently raised through the grievance process and the other allegations amounted to no more than petty slights. We do not agree. At the time of the conduct in question, Bumpers was the chief of Metro PD. Having the head of the organization where an employee works pressuring supervisors to lower the employee's evaluation without justification, striking back against a supervisor who failed to do so, and telling those supervisors not to trust the employee and to look for reasons to reprimand them could reasonably be seen as likely to deter discrimination victims from complaining to the EEOC, the courts, or their employers. *See Navy*, 407 S.W.3d at 901. Indeed, as mentioned above, Douglas listed by name several other officers who told her they were leery of complaining because of what had happened to her. These were not mere petty slights. The fact that Douglas won her grievance against the lowered evaluation does not wholly eliminate the deterrent effect of the action. Douglas was forced to go through the grievance process to challenge this action by the chief and a captain in the department.[1]

---

[1] In our prior opinion, we identified several factors that can be used in determining whether an employer's actions were materially adverse. *Douglas*, 544 S.W.3d at 494. Those factors included: the effect the act had on the employee's prestige, opportunity for advancement,

In isolation, Douglas's transfer from working under Clark to working under Vara does not appear to rise to the same level as the other allegations. Douglas stated in her declaration that she would have normally stayed in her position with professional standards, a purportedly elite posting, longer than the time she was there. She notes that her transfer came after she filed her EEOC charge and moved her from working under Clark, who had refused to change her evaluation, to working under Vara. She also presented evidence that Bumpers told Vara about the EEOC charge and not to trust Douglas. Douglas acknowledged, however, that Metro lieutenants are regularly rotated; she herself worked in four different departments in seven years. Moreover, there was also evidence that this rotation was department-wide, was due to promotions and departmental needs, and involved other lieutenants and sergeants, and since Metro only has three captains, it was not surprising she would end up working under Vara. Douglas acknowledged that the transfer was not a demotion and did not result in any changes to her pay or other working conditions. However, even if the fact of the

---

pay, core job duties, and ability to obtain outside employment. *Id*. While helpful, these potential factors are not requirements. *See id*. ("The presence or absence of any of these factors is not dispositive because the effect of a challenged action must be considered as a whole in light of all the circumstances."). Although reference to these factors does not tell the full story in this case, the evidence indicates that Bumpers actions negatively impacted Douglas's prestige as Bumpers was reputedly disparaging Douglas's abilities and trustworthiness to two of three captains in the department, had her performance evaluation downgraded, and forced her to go through the grievance process. Additionally, Bumpers alleged reaction to Douglas's protected activity rendered her chances for promotion bleak.

In its reply brief, Metro suggests that in mentioning three occasions on which Bumpers allegedly pressured supervisors to downgrade her performance evaluation, Douglas is effectively attempting to raise a hostile work environment claim when she did not include such a claim in her pleadings. *See generally Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 806 (Tex. 2010) (discussing hostile work environment claims). We disagree. The heart of Douglas's retaliation claims are that Bumpers pressured her supervisors to lower her performance evaluations and transferred her to work under Vara. Douglas does not appear to allege a hostile work environment. The additional allegations discussed provide important context for our review. *See id*.

25

transfer by itself does not rise to the level of actionable retaliation, the incident provides context and support for the other retaliation allegations. *See, e.g.*, *Navy*, 407 S.W.3d at 900 ("[T]he significance of any given act of retaliation will often depend upon the particular circumstances. Context matters.").

Lastly, Metro challenges Douglas's evidence regarding the causal nexus between Douglas's protected activity and the alleged retaliation. Retaliation claims are subject to a traditional "but for" measure of causation, i.e., the plaintiff must show that she would not have suffered an adverse employment action but for engaging in protected activity. *Id.* at 901. Metro asserts that Douglas has not identified any evidence other than Metro's knowledge of her claims to support a causal connection. An employer's knowledge of a complaint, standing alone, is insufficient to demonstrate the required causal link in a prima facie retaliation case. *Donaldson v. Tex. Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 444 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). Metro also argues that the temporal gap between Douglas's protected activity and the allegedly retaliatory actions was too great. We disagree with Metro on both points.

Douglas reported in her declaration that Bumpers had given her "distinguished" evaluations "both in 2012-2013 and in 2014," but evidence indicated that after Douglas filed her EEOC charge in 2015, Bumpers pressured Douglas's supervisors three times to lower her rating below distinguished, told one of the supervisors to look for things on which to reprimand Douglas, and told the other supervisor about the EEOC charge that involved the supervisor and warned him not to trust her. There was also evidence Bumpers had lowered one of the supervisor's evaluations after he refused to downgrade Douglas's evaluation. Douglas also noted that Bumpers had tried to dissuade her from filing an EEOC charge in the first place. There is more evidence here of a causal nexus than just

26

Metro's knowledge that Douglas had filed a charge.

Metro cites cases indicating that temporal proximity between a protected act and an adverse employment action may be evidence of a causal connection when the two are separated by only a short period of time. *See Gonzales v. Dupont Powder Coatings USA, Inc.*, 546 F. App'x 378, 379 (5th Cir. 2013); *Raggs v. Mississippi Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002); *Crutcher v. Dallas I.S.D.*, 410 S.W.3d 487, 496 (Tex. App.—Dallas 2013, no pet.). Each of these cases, however, concerned whether temporal proximity alone was evidence of a causal connection. *See Gonzales*, 546 F. App'x at 379; *Raggs*, 278 F.3d at 471; *Crutcher*, 410 S.W.3d at 496. As set forth above, there is more evidence here of a causal nexus than just temporal proximity.

Douglas presented sufficient evidence to support a prima facie case of retaliation. Accordingly, the trial court did not err in denying Metro's plea to the jurisdiction and motion for summary judgment on Douglas's retaliation claim. We therefore overrule Metro's second issue.

### *Conclusion*

Having overruled each of Metro's issues, we affirm the trial court's denial of Metro's combined motion for summary judgment and plea to the jurisdiction.


/s/    Frances Bourliot
        Justice


Panel consists of Justices Wise, Bourliot, and Spain.

27